J-S73008-19

## 2020 PA Super 68

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1163 MDA 2019 |

Appeal from the Decree Entered July 1, 2019
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s):  5 of 2019

| | | |
|---|---|---|
| IN RE: K.R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1164 MDA 2019 |

Appeal from the Decree Entered July 1, 2019
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s):  6 of 2019

BEFORE:  SHOGAN, J., LAZARUS, J., and MUSMANNO, J.

OPINION BY SHOGAN, J.: **FILED MARCH 24, 2020**

Appellant, C.W. ("Mother"), who is incarcerated at State Correctional Institution ("SCI") Cambridge Springs, seeks review of the July 1, 2019 decrees[1] involuntarily terminating her parental rights to her two minor

_____

[1] While the decrees are dated June 18, 2019, the Northumberland County Orphans' Court filed them on July 1, 2019.

daughters, A.W.,[2] born in June of 2006, and K.R.S., born in September of 2011 (collectively, "the Children), in these consolidated appeals.  After careful review, we affirm.

We summarize the factual and procedural history as follows.  The Children have been in placement since November 8, 2017, due to the discovery of a methamphetamine lab in Mother's home.  N.T., 6/13/19, Part I, at 7.[3]  Mother was convicted of a crime involving the possession and manufacture of methamphetamines, for which she is serving a sentence of incarceration of nine to twenty-four months at SCI Cambridge Springs.  N.T., 6/13/19, at 72.  Mother testified that this sentence runs concurrently with her sentence for a separate crime involving the delivery of drugs that resulted in a death, for which she received five to ten years of imprisonment.  *Id.* at 72–74.

On January 28, 2019, Northumberland County Children and Youth Social Service Agency ("the Agency") filed petitions for the termination of the parental rights of Mother and the fathers of A.W. and K.R.S. pursuant to 23

_____

[2]  Mother misidentifies A.W. as "A.S." in her notice of appeal.  The record confirms that the child's surname begins with "W."  Accordingly, we have corrected the caption.

[3]  The certified record includes two separate transcripts from the June 13, 2019 hearing.  The first transcript, which we designate as Part I, involves the petition for the termination of parental rights of the father of K.R.S.  The second transcript involves the petition for the termination of Mother's parental rights.  Unless otherwise designated, all references to the notes of testimony from the June 13, 2019 hearing are from the transcript involving the termination of Mother's parental rights.

Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). A hearing on the petitions commenced on May 15, 2019.

Prior to presenting its case, the Agency's counsel stated on the record in open court, "It's my understanding that [Mother] and [the father of A.W.] have executed voluntary relinquishments of their parental rights at this time." N.T., 5/15/19, at 2. Mother's counsel agreed and stated, "[Mother] has just executed the voluntary relinquishment and consent to adoption forms." *Id.* Mother's counsel further declared:

> I'm satisfied and I can represent to the [c]ourt that this was done intelligently, voluntarily by [Mother]. And I'm quite certain that she understands what we're doing today, what these documents represent, and she is doing this without any pressure being brought to bear on her, and that this was a voluntary decision on her part to execute these relinquishments.

*Id.*

The trial court then posed the following two questions to Mother:

[Q]: What I wanted to ask you also is that you heard your attorney explaining that this was a knowing, voluntary, and willing relinquishment. Is that correct?

[A]: Yes.

[Q]: Do you have any questions regarding this procedure at all?

[A]: No.

[Q]: Very well.

N.T., 5/15/19, at 3. Thereafter, the court immediately concluded the hearing.

On May 21, 2019, the Agency filed a motion for re-hearing on the termination of parental rights. The Agency alleged that following the May 15,

2019 hearing, it learned that Mother's "consent was not voluntary as it was conditioned upon a Post-Adoption Contact Agreement (PACA) being drafted by a non-party, the terms of which were not discussed." Motion, 5/21/19, at ¶ 7. The Agency further alleged, "[T]he Voluntary Relinquishment and Consent to Adoption of [M]other is not voluntary if the same is contingent upon the execution of a PACA." *Id.* at ¶ 8. As such, the Agency requested that the orphans' court reschedule the hearing on its termination petitions with respect to Mother. By order dated May 29, 2019, the court granted the Agency's request.

The rescheduled termination hearing occurred on June 13, 2019.[4] The hearing commenced with oral argument and Mother's testimony regarding her voluntary relinquishment and consent to adoption. The Agency's counsel argued that Mother's relinquishment was not voluntary "because it was contingent upon a PACA being entered into." N.T., 6/13/19, at 5. As such, the Agency, the Children's counsel, and the GAL requested that the court deem Mother's consent involuntary and proceed with the termination hearing. *See id.* at 24-26.

By way of explanation, the Children's counsel stated that she and the GAL inquired of Mother's counsel on May 15, 2019, if Mother "may be

_____

[4] During the hearing, Kathleen A. Lincoln, Esquire, served as the Children's counsel, and Cindy J. Kerstetter, Esquire, served as the Children's guardian *ad litem* ("GAL").

interested in hearing what [the C]hildren had to say about a post-adoption contact." *Id.* at 9. The Children's counsel stated that they then relayed to Mother in the presence of her counsel:

> [The Children], in fact, wanted to be adopted. They told me that. [The GAL] and I were together when we saw the [C]hildren. And [the Children] wanted to receive cards and letters from their natural mother. And would [Mother] be open to that.
>
> I explained to [Mother] what a [PACA] was. I explained to her it was fully voluntary. That it was fully voluntary on the part of the foster parents as well. That no one could promise anything or coerce anyone into entering anything but it would absolutely be voluntary and that if that was something [Mother] was interested in, I certainly was in support of it. And that [Mother] should discuss that with her attorney.

N.T., 6/13/19, at 19. On cross-examination by the Agency's counsel, Mother testified:

> Q. Did you sign that consent based upon a promise that there would be a PACA agreement?
>
> A. I was told that we were going to have ten days to draft a PACA if everyone was in agreement with me, . . . my lawyer, [A.W.'s father], his lawyer, and the advocates and [the Agency] lawyer that we spoke with.
>
> Q. So you signed that consent believing that there was going to be a PACA agreement?
>
> A. I signed that consent on behalf that I still be in contact with my children versus what my children said.

*Id.* at 20. Based on the admission of Mother's counsel as well as Mother's testimony, the orphans' court found that Mother's consent was not voluntary. *Id.* at 26; Orphans' Court Opinion, 2/3/20, at unnumbered 3–4.

On June 13, 2019, the orphans' court then proceeded with the involuntary termination hearing.[5] The Agency presented the testimony of its caseworkers, Lakenyia Taylor and Kacie Burk. Mother testified on her own behalf.

By decrees dated June 18, 2019, which the orphans' court filed on July 1, 2019, the court involuntarily terminated Mother's parental rights.[6] On July 12, 2019, Mother timely filed notices of appeal and concise statements of

_____

[5] Following the court's conclusion that Mother's voluntary relinquishment was not voluntary, Mother testified on inquiry by her counsel:

> Q. [D]o you wish to proceed today with the involuntary termination or do you wish to confirm your original consent knowing that there will be no PACA apparently. . . ?
>
> A. To be completely honest[,] I would like to have more time to figure out what I need to do for the best interest of myself and my children. And I do not feel that I can make that agreement today.
>
> All this happened so fast and beyond my control, and I did not know what was happening or what was going on. So I can't answer that today.

N.T., 6/13/19, at 34–35.

[6] By order dated August 29, 2019, the orphans' court terminated the parental rights of [A.W.'s father] following a hearing on the Agency's petition to confirm his consent made on May 15, 2019. As noted *supra*, A.W.'s father did not file a notice of appeal.

The orphans' court involuntarily terminated the parental rights of K.R.S.'s father on the record in open court on June 13, 2019. N.T. (Part I), 6/13/19, at 11. It is important to note that neither the certified docket nor record include a written order involuntarily terminating the parental rights of K.R.S.'s father. In addition, the father of K.R.S. did not file a notice of appeal.

errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[7] However, on August 19, 2019, the orphans' court ordered Mother to file a concise statement within twenty-one days. By order dated September 4, 2019, the orphans' court stated that because Mother did not provide the concise statement, it would not provide an opinion pursuant to Pa.R.A.P. 1925(a).

On January 24, 2020, this Court remanded the certified record and retained jurisdiction, for the following reasons. We observed that the lower court dockets reflected that Mother filed, on July 12, 2019, with a docketing date of July 15, 2019, the following documents: (1) notice of appeal; (2) concise statement of errors complained of on appeal; (3) request for transcript; (4) affidavit of service; and (5) application for leave to appeal *in forma pauperis* and certificate of counsel. We next observed that the Northumberland County filing office erroneously forwarded the original documents, rather than their duplicates, to this Court in contravention of Pa.R.A.P. 905 (Filing of Notice of Appeal). Upon further review, we observed that the original affidavit of service stated that Mother's counsel served the lower court and opposing counsel in person and served Mother by first class mail.

---

[7] This Court consolidated Mother's appeals *sua sponte* on August 27, 2019.

As such, in addition to remanding the certified record, we directed the Superior Court Prothonotary to forward the original foregoing documents to the orphans' court. We then directed the Northumberland County Prothonotary to incorporate those documents into the certified record. Finally, this Court directed the orphans' court to file an opinion pursuant to Pa.R.A.P. 1925(a), upon which we directed the Northumberland County Prothonotary to return the certified record to this Court, along with a copy of the foregoing documents pursuant to Pa.R.A.P. 905. *In re Adoption of A.*[*W.*], 2020 WL 406849, 1163 and 1164 MDA 2019 (Pa. Super. filed January 24, 2020) (Non-Precedential Decision). On February 3, 2020, both the orphans' court and the Northumberland County Prothonotary complied.

This case is now ripe for our review. Mother raised the following single issue in her appellate brief:

> Whether the [orphans'] court erred in determining that Mother did not enter a voluntary relinquishment and by voiding the voluntary relinquishment and thereon proceeding immediately to a hearing on involuntarily terminating her parental rights[?]

Mother's Brief at 8.[8]

---

[8] Mother waived any challenge to the orders under 23 Pa.C.S. § 2511(a) and (b) by failing to raise any such challenge in her concise statement and brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2006) (concluding that the appellant waived challenges regarding Sections 2511(a) and (b) by not including those claims in her statement of questions presented and in failing to develop an argument).

Our standard of review is abuse of discretion. *In re C.M.C.*, 140 A.3d 699, 704 (Pa. Super. 2016). We have explained:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and [whether] the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*Id.* at 705 (citations omitted).

This Court has recognized "the bifurcated nature of the adoption process" as set forth in the Adoption Act ("the Act"), 23 Pa.C.S. §§ 2501, *et seq.* *In re A.M.B.*, 812 A.2d 659, 669 (Pa. Super. 2002); *see also* 23 Pa.C.S. §§ 2501-2558, "Proceedings Prior to Petitions to Adopt"; 23 Pa.C.S. §§ 2701-2742, "Petition for Adoption"; and 23 Pa.C.S. §§ 2901-2938, "Decrees and Records."

Chapter 25 of the Act governs both voluntary relinquishment and involuntary termination of parental rights. This Court has stated, "Parental relinquishment and involuntary termination are . . . mutually exclusive[,] and a determination must be made as to which and when one or the other applies. This is a judicial function in which the judge exercises his discretion in conformity with the facts and the law." *A.M.B.*, 812 A.2d at 666.

The Act provides two alternative procedures with respect to the voluntary relinquishment of parental rights. The parent may file a petition to relinquish parental rights pursuant to Section 2501 (Relinquishment to

agency) or Section 2502 (Relinquishment to adult intending to adopt the child). Alternatively, the agency or the adoptive parent may file a petition to confirm a birth parent's consent to adoption under Section 2504 (Alternative procedure for relinquishment). *C.M.C.*, 140 A.3d at 708. We explained therein:

> The Adoption Act requires the trial court to hold a hearing, and for the relinquishing parent to ratify his or her consent to termination, no less than 10 days after the petition is filed. *See* 23 Pa.C.S. § 2503(a). The comment to Section 2503 explained:
>
> > Subsection (a) is amended to make the petitioner's appearance at the hearing mandatory. The petitioner's in-court ratification of consent assures due process requirements in view of the finality of the termination decree as to the parent.
>
> 23 Pa.C.S. § 2503(a) cmt.

*C.M.C.*, 140 A.3d at 709.

Our Supreme Court has stated that the "consent prescribed by the Adoption Act is a parental consent that is intelligent, voluntary and deliberate." *In re M.L.O.*, 416 A.2d 88, 90 (Pa. 1980) (citation omitted). As such, this Court has explained "that the purpose of the hearing on the petition for voluntary relinquishment is to insure an intelligent, voluntary, and deliberate consent to the termination of parental rights." *C.M.C.*, 140 A.3d at 711 (citation omitted).

In the case *sub judice*, we note that following the May 15, 2019 hearing, Mother had not petitioned to relinquish her parental rights pursuant to Section 2501 or 2502. Likewise, the Agency had not petitioned to confirm Mother's

consent pursuant to Section 2504.  Therefore, the only petitions pending before the court on June 13, 2019, were for the involuntary termination of the parental rights of Mother, as well as the father of K.R.S.

Chapter 27, Subchapter D, commonly referred to as Act 101, is titled, "Voluntary Agreement for Continuing Contact."  Based on these provisions, an adoptive parent is not required to allow post-adoption contact.  The relevant provision provides:

> **§ 2731. Purpose of subchapter.**
>
> The purpose of this subchapter is to provide an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact that:
>
> > (1)  is in the best interest of the child;
> >
> > (2)  recognizes the parties' interests and desires for ongoing communication or contact;
> >
> > (3)  is appropriate given the role of the parties in the child's life; and
> >
> > (4)  is subject to approval by the courts.

23 Pa.C.S. § 2731.  If a voluntary agreement is entered into by the parties, Section 2735, "Filing and approval of an agreement," provides that the agreement "shall be filed with the court that finalizes the adoption of the child."  23 Pa.C.S. § 2735(a).  However, the agreement "shall not be legally enforceable unless approved by the court."  23 Pa.C.S. § 2735(c).  The court "shall approve the agreement" based on the factors set forth in the statute. 23 Pa.C.S. § 2735(b)(1), (2).

This Court has recognized that the Act does not include a provision that permits a parent to condition his or her relinquishment on the adoptive parent allowing continuing contact. **C.M.C.**, 140 A.3d at 711–712. In **C.M.C.**, we held that the mother, whose relinquishment was conditioned on a PACA, did not "intelligently, voluntarily, and deliberately" consent to terminate her parental rights. **Id.** at 711; **see also In re K.G.M.**, 845 A.2d 861, 865 (Pa. Super. 2004) (stating, "We are unwilling to allow the termination of . . . parental rights, however, without strict compliance with the procedures set forth by the Legislature . . . .").

On appeal, Mother acknowledges that when the Children's counsel and GAL told her on May 15, 2019, that the prospective adoptive parents would be willing to sign a PACA, she "leaped at this opportunity to maintain contact with her daughters . . . ." Mother's Brief at 14. Moreover, Mother acknowledges that this rendered her consent not voluntary. **Id.** at 15–16, 18. Thus, Mother describes her question on appeal as follows:

> The real issue, respectfully, is the glaring contradiction between the law, which on one hand requires that the record remain unsullied with any inferences that the parent executed a voluntary relinquishment under any pressure, and the undeniable fact that the [PACA] is maybe the reason why many parents execute voluntary relinquishment of the[ir] parenthood, rather than proceed with the prospect of an involuntary termination of their parental rights. . . .
>
> It would appear that the legislature completely ignored this conundrum of conflicting interests.

Mother's Brief at 16-17.

- 12 -

This Court has explained that exceptions to the Act may not "be judicially created where the Legislature did not see fit to create them." **K.G.M.**, 845 A.2d at 865 (citing **In re Adoption of E.M.A.**, 409 A.2d 10, 11 (Pa. 1979)). Based on the foregoing statutory and case law, we discern no abuse of discretion by the orphans' court in finding that Mother's decision to relinquish her parental rights was not made voluntarily on May 15, 2019. Therefore, it was invalid under the Adoption Act, and the court properly proceeded on the Agency's involuntary termination petitions. **C.M.C.**, 140 A.3d at 711 (holding, "Without a valid of waiver of her right to post-adoption contact, we cannot conclude that [the m]other intelligently, voluntarily, and deliberately consented to terminate her parental rights. [The agency] should have proceeded on its petition under Section 2511(a) and (b)."). Mother's claim fails.

In the alternative, Mother argues, that to the extent the Agency claimed that Mother was pressured into the voluntary relinquishment of her parental rights, this is untrue. Mother contends:

> The only "pressure" exerted in this matter was on the prospective adoptive parents to follow through with the promised PACA or Mother might vitiate her voluntary relinquishment. That "pressure[,]" if you will, was made by this instant counsel in order to facilitate the proffered PACA to Mother.

Mother's Brief at 18.

The orphans' court did not find that Mother "was pressured" into voluntarily relinquishing her parental rights on May 15, 2019. Rather, the

court found that Mother's consent to terminate was contingent upon a PACA with the adoptive parents.[9]  Because we have determined that the orphans' court did not abuse its discretion in finding that Mother's decision to relinquish her parental rights was not voluntarily made, this claim fails.  Accordingly, we affirm the decrees involuntarily terminating Mother's parental rights.

Decrees affirmed.


Judgment Entered.

_Joseph D. Seletyn_ (signature)

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/24/2020

---

[9] During the proceeding on June 13, 2019, the Agency's counsel stated on the record in open court:

> I never meant to intimate that—and if this is the way it was taken, I apologize—anyone had placed any pressure on [Mother] to sign [the consent].  I think that she just signed it not understanding that it . . . had to be not contingent upon a PACA.  And I'm not sure where everybody thought that I was intimating that she had been pressured into signing anything.  That was not at all my intent.

N.T., 6/13/19, at 22.